318 So.2d 746

Charles Edward JEMISON

v.

STATE.

6 Div. 775.

Court of Criminal Appeals of Alabama.

Aug. 19, 1975.

William J. Baxley, Atty. Gen., Montgomery, and David L. Weathers, Asst. Atty. Gen., Birmingham, for the State.

Jesse W. Shotts, Birmingham, for appellant.

HARRIS, Judge.

Appellant was indicted and tried for the crime of rape. At arraignment, with his counsel present, he pleaded not guilty. The jury found him guilty as charged in the indictment and fixed his punishment at twenty years and one day in the penitentiary. The court adjudged him guilty and sentenced him in accordance with the verdict of the jury. He gave notice of appeal. He was found to be indigent and a free transcript was furnished him. Trial counsel was appointed to represent him on appeal.

This is another inter-racial rape case. Appellant did not testify at his trial but offered the testimony of his mother, father and two employers in support of his alibi.

The prosecutrix was a fifty-six year old married woman living with her husband and three children on July 19, 1973. She was employed by the Birmingham News and had been so employed for nine and a half years. She testified that she left for work that morning just before 5:00 A.M. and was driving her own car. She parked her car on 22nd Street between 5th and 6th Avenues right beside the First Baptist Church which was just a short distance from the News building. She placed the time between 5:15 and 5:20 that morning. She stated that she backed into the parking place, took the keys out of the ignition and put them in her purse and got her parking money out. She picked up her lunch and turned to open the door and saw a black man at the window with a knife in his left hand. It was breaking day at the time and she could clearly see the man. She hollered and the man opened the door and told her to get out and not say a word. She got out and he closed the car door.

He told her to put her right arm around his waist and she kept saying, "No, No." He threatened her with the knife if she didn't do what he said. She put her right arm around his waist and he put his left arm around her waist. He started walking her to the corner of the church and started up 6th Avenue. She saw two or three cars coming and she tried to pull away from him to attract the attention of the people in these cars. When she made this attempt to get away from him, he hit her on her nose with his right fist causing it to bleed. The blow to her nose stunned her and she dropped her purse. She attempted to pick it up and he would not let her. He warned her not to try and do that again or he would kill her, saying, "He didn't have anything to lose."

He led her about middleway the block and then crossed the street. He kept telling her to get closer to him and not try to pull away from him again. He asked her if she had ever loved a black man and she said, "No, of course not," and he said, "Well, you are now." She began pleading with him not to do anything to her and he told her not to say anything and wake any of the people up in the housing project. He led her down the stairwell of an apartment complex and told her to lie down on her back and remove her underclothes. He still had the knife drawn on her and still warned her not to say anything. She removed her underclothes and he proceeded to have sexual relations with her. He tried two or three times to penetrate her without success and finally took his hand and forced his private part into her private parts. According to her testimony the sexual act did not last over ten minutes and he did not climax. He got up and told her she wasn't fit for a dog to touch and left her saying he had to go catch a bus.

After he left she put her clothes on as best she could and ran toward Twenty-second Street trying to stop traffic. Finally she stopped a cab driver and told him what had happened and he radioed his cab stand

to notify the police. Two uniformed police officers arrived and she told them what had happened and described her assailant and how he was dressed. The officers carried her to the University Hospital where she was seen and examined by Dr. Wallace Evans.

During appellant's trial she was asked if the man who raped her was in the courtroom and she answered, "Yes, sir." She was asked to point him out and she pointed to appellant and said, "Right there (indicating) no doubt in my mind, absolutely."

On cross-examination she testified the man was clean shaven and did not have a mustache or a goatee. She stated he had on dark trousers and they were flared legs. That he had on a black seersucker sport shirt and the shoes or boots he was wearing were patent black with heals about two inches high. She said he had been drinking and she could smell the odor of whiskey on his breath but he was not intoxicated. She further stated that he was five feet ten or eleven inches tall and weighed 170 to 175 pounds; that he kept his knife in his hand at all times.

She further testified that when she got to the hospital the whole front of her dress was bloody.

The husband of the prosecutrix testified that he saw her in the hospital around seven o'clock that morning and she was crying and her face was bloody and her whole chest was bloody. She was still in the emergency room when he saw her.

Police Officer M. L. Howell together with his partner, Officer Rhodes, responded to the rape call from the cab stand. The call came in at approximately 5:20 A. M. They found prosecutrix standing by the taxi cab on Twenty-second Street. He testified that she had blood on the front of her clothing and on her stockings where they had been torn and she was bleeding around the nose and mouth. Her hair was in disarray at the time he first saw her.

The prosecutrix was recalled to the witness stand and testified that around 1:30 P.M., on August 4, 1973, she viewed a lineup of six Negroes at the City Jail and immediately identified appellant as the man who raped her on July 19, 1973. She said he was number three in the lineup of six Negroes all about the same height and build.

On cross-examination she testified she was wearing a solid beige dress on the occasion and that it had blood all over the front of it. She further testified that a man working with a construction crew near the place where she dropped her purse found it and turned it over to the Police Department and a policeman brought it to her.

The prosecutor for the state and defense counsel stipulated the testimony of Dr. Wallace Evans, the gynecologist who examined the prosecutrix on the morning of July 19, 1973.

In sum, his testimony was that he graduated from the University of South Carolina in 1969 with a Bachelor of Science Degree. In 1973, he graduated from the University of Alabama School of Medicine with an M.D. Degree and began special training in obstetrics and gynecology and completed a year of that special training.

He examined the prosecutrix at 7:00 A. M. on July 19, 1973, in the emergency room at the University Hospital. He observed some redness on her face. There were abrased areas under the left eye and cheek and there was blood coming out of her nose, especially on the left side. She also had some abrased areas on her back over the shoulder blade and her right forearm. The bruises were recent. He observed some abrased areas on examination of the vagina and inside the vagina. She was very excited. She was crying at the time. Her blood pressure was quite elevated and her pulse was very rapid. He did

not find any sperm in the vagina. It was his opinion that she had recently had sexual intercourse as the entrance to her vagina was bruised and there were some small tears in the skin at the entrance to the vagina.

In support of appellant's alibi, his mother testified that appellant was separated from his wife on July 19, 1973, and was living with her, his father, a brother and a sister. She stated that she got up and cooked breakfast for the family, that she waked appellant about 5:15 o'clock that morning and he left for work with his father at about ten minutes to six.

On cross-examination she testified that appellant worked for the Royal Cup Coffee Company and that his hours of employment were from 6:30 A.M. until 5:00 P.M. She was asked specifically if appellant wore a goatee on July 19, 1973, and answered, "I don't know."

The father testified that neither he or appellant ate breakfast on July 19, that they only drank coffee. He said he worked for South Central Bell and that he probably dropped his son off near the Royal Cup Coffee Company at five minutes to six o'clock that morning.

Mr. Raymond R. Hendon testified that he was Vice-President of Royal Cup, Incorporated and that appellant was an employee of the company. He said the week time book showed that appellant was at work on July 19, 1973, and the starting time was six-thirty. He stated that appellant had a goatee when he hired him and when he left. He estimated the goatee was about an inch and a half long.

On cross-examination he testified the company kept a time book on the number of hours its employees worked. He said he had no hours marked for appellant during the week of July 19, "not as such." The time sheet did not show when appellant reported for work. He was asked if he saw him at seven o'clock that morning and he said he could not remember.

Mr. J. O. Capps testified that he was employed by the Royal Cup Coffee Company and that appellant worked directly under his supervision. He stated that appellant had a goatee an inch to an inch and a half all the time he worked for the company.

On cross-examination he was asked what time appellant reported for work on July 19, 1973.

From the record:

"Q You don't even know what time he got to work that day do you?

A Well, that far back I couldn't know. He wasn't too bad late, anyway, when he come to work.

Q You don't know where this man was at five o'clock, five fifteen, or five thirty on that day, July 19, 1973, do you?

A No sir."

The time frame as to the alibi evidence was weak and uncertain in many instances. Alibi testimony, like all other evidence in a criminal prosecution, is an issue to be determined by the jury. This alibi evidence was considered and rejected by the jury. *Brown v. State,* 229 Ala. 58, 155 So. 358; *Gillis v. State,* 242 Ala. 550, 7 So.2d 563; *Mosley v. State,* 54 Ala.App. 59, 304 So.2d 613; *Smith v. State,* 53 Ala. App. 27, 296 So.2d 925.

Likewise, conflicting evidence is always a question for the jury to determine. *Morris v. State,* 47 Ala.App. 132, 251 So.2d 629; *Jones v. State,* 54 Ala.App. 251, 307 So.2d 59.

The jury may convict upon the prosecutrix's testimony alone if such evidence convinces the jury beyond a reasonable doubt that the accused is guilty. *White v. State,* 37 Ala.App. 448, 70 So.2d 287; *Robinson v. State,* 53 Ala.App. 145, 298 So.2d 75.

On the question of photographic identification the Supreme Court of the United States in *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247, held:

"Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs. The danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error. We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement. Instead, we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. \* \* \*"

The sufficiency of the evidence to convict appellant is not presented in the record before us. There was no motion to exclude the state's evidence; there was no motion for a new trial; there was no request for the affirmative charge; there were no exceptions reserved to the court's oral charge to the jury, and there were no adverse rulings on the admissions of evidence that in any wise affected the substantial rights of appellant. *Eady v. State,* 48 Ala.App. 726, 267 So.2d 516; *Grant v. State,* 46 Ala.App. 232, 239 So.2d 903; *Robinson v. State,* 46 Ala.App. 684, 248 So.2d 583.

 We have carefully examined the entire record for errors injuriously affecting the substantial rights of appellant and have found none. Accordingly, the case is affirmed.

Affirmed.

All the Judges concur, except CATES, P. J., not sitting.