HARRIS, Judge.
Appellant was convicted of murder in the first degree and the jury fixed his punishment at life imprisonment in the penitentiary. He was represented by retained counsel at arraignment and trial. He pleaded not guilty. After sentence was imposed he gave notice of appeal. Upon a proper petition he was determined to be indigent and was furnished a free transcript. Trial counsel was appointed to represent him on this appeal.
On the night of May 14, 1976, appellant shot and killed Jimmy Ford, Jr. in a tavern called Old Cloud 9 in Russell County, Ala- ' bama. The wife of the victim, Daisy Ford, was a witness to the killing. According to her testimony she was employed as a waitress at Old Cloud 9 and worked there two nights a week. The place was only opened on Friday and Saturday of each week. She testified that she opened the place at around 7:00 p. m. and appellant was there at that time. She fixed him two hot dogs and sold him a package of cigarettes. Her husband came in shortly thereafter and appellant asked him to play cards. The deceased told appellant that he did not want to play cards but appellant insisted and gave his car keys to the deceased to go home and get a deck of cards. When he returned the deceased and appellant started playing cards for money. Appellant lost sixty dollars and left the place saying he had to go check on his children. Appellant lived three houses from Old Cloud 9. He was gone fifteen or twenty minutes and returned with fifteen dollars and said he wanted to play cards again. He lost his fifteen dollars and left the place again. He was gone twenty or more minutes and returned to the club. At this time the deceased was playing cards with one Robinson. According to Daisy Ford when appellant returned to the club the third time he had his right hand in his pocket and he walked up to the bar and put two quarters and a. dime on the bar and ordered a beer. He started drinking the beer and walked over to the table where the card game was in progress. He sat in a chair at the table and watched the game for a few minutes. Appellant then got up and walked around the table and stood over the deceased at which time he pulled his pistol and shot the deceased twice while he was still sitting in the chair. Daisy Ford further testified that she did not hear any cross words exchanged between her husband and appellant prior to the shooting and that her husband was unarmed at the time appellant shot him. Five photographs of the shooting scene showing the deceased still sitting in a chair at the *569 table were introduced into evidence without objections.
On cross-examination this witness stated that she could see the men playing cards from the edge of the bar where she was standing. She said at no time did she see appellant with a walking cane and that he was three or four feet from the deceased when he shot him. After the shooting she stated she was going to call the police and she heard appellant say he was going to call the so and so’s himself but he did not do so. She further stated that she could see her husband at the time appellant fired the two shots but she did not go near the body of her husband where he was still seated in the chair where he was when appellant fired two shots into his body.
Daisy Ford further testified that she did not see any money on the table while anyone was playing but she did see the cards. She said she did not know what became of the cards when she went to call the police and that when she got back to the club the officers were there. She stated that the next day she went to the coroner’s office to get her husband’s property. The coroner gave her $93.65, her husband’s billfold, Social Security card, and his keys.
Johnny Robinson testified that he was at the Old Cloud 9 Club on the night appellant shot and killed the deceased. That he played cards with the deceased and appellant for a few minutes and that appellant stopped playing and he and the deceased continued to play. He stated that appellant left the club and when he returned he walked up and said something to the deceased about some money and then shot him. He said appellant was approximately two or three feet from the deceased when he shot him. He further testified that he did not hear the deceased say anything to appellant before he was shot or do anything to him, nor did he see a weapon of any kind on the deceased. Robinson stated that nothing was moved after the shooting took place until the police arrived. This witness did not remember whether appellant was using a walking stick or wearing a collar that night. He stated that a man named Allen Davis and another man whom he did not know were in the place at the time of the shooting but he didn’t think they ever sat down.
On cross-examination Robinson stated that appellant fired two or three shots in rapid succession. Prior to the shooting appellant said something to the deceased about some money and he thought appellant said something about three or four dollars. He further stated that after the shooting he removed the cards from the table. Robinson further stated that he saw appellant with a gun before and after the shooting and after the first shot he jumped up from the folding chair he had been sitting in. He stated that he didn’t see the money on the floor until after the police arrived.
On redirect examination Robinson stated that before the shooting nobody prevented appellant from walking out of the door and leaving the place; that he could have walked out of the building without passing near the position where the deceased was sitting in the chair.
Detective Robert Sawyer of the Phenix City Police Department and Detective Lee investigated the shooting at the Old Cloud 9 Club on May 14, 1976. Sawyer testified that when he and Lee entered the place he saw a man sitting in a chair with his head leaning back and blood was coming out of his head where he had apparently been shot. He stated that he went outside to ascertain who did the shooting and saw the wife of the deceased crying. He was told that the man who did the shooting was Charlie Harris and he lived two doors from Old Cloud 9. His car was still parked in front of the club. Sawyer left Detective Lee at the club to secure the place.
Sawyer further testified that he and Deputies Woodard and Johnson went to appellant’s house and he knocked on the door. Someone asked who was there and he replied, “Police.” That appellant opened the door and had a pistol sticking in his right front pocket with the handle sticking out. Sawyer saw appellant reach for the pistol and put his fingers on it and Detective *570 Sawyer grabbed appellant’s hand and told him, “Don’t touch the gun.” Sawyer took the pistol from appellant’s pocket and told him he was under arrest and advised him of his rights. Appellant then stated, “I was expecting you. I shot him.” Sawyer put his initials on the pistol and turned it over to Deputy Sheriff Woodard. He stated that when appellant came to the door he did not have a walking cane and he was not wearing a neck collar such as he was wearing at trial. The pistol was identified and admitted into evidence without objection. He stated that the pistol was in the same condition when he gave it to Deputy Woodard as it was when he took it from appellant’s pocket except for the fact that he unloaded it. He didn’t find any spent cartridges and the pistol was fully loaded. He turned the live rounds over to Deputy Woodard along with the pistol.
On cross-examination he stated that when he entered the club he saw some money on the floor near the left hand of the deceased who was still in the chair, but he did not touch the money as he left to find appellant. He further testified that other than an attempt to pull his pistol, appellant did not resist the arrest. Deputy Johnson went in the house and got appellant’s walking cane, and he was not handcuffed when he was put in the patrol car.
Detective Albert Douglas Lee testified that he took photographs of the scene of the shooting showing the deceased was still sitting in a chair when he and Detective Sawyer entered the club. He stated that he recovered $90.00 that was lying on the floor near the left hand of the deceased. Detective Lee did not see or observe anything in the pockets of the deceased or on or near his body that resembled a gun or a knife. He turned the money over to the County Coroner. He said there were no cards on the table.
Deputy Sheriff Tom Wilson Woodard testified that he and Deputy Johnson got a call to go to Old Cloud 9 Club on May 14, 1976, at approximately 11:00 p. m. That when they got to the scene they found that Johnny Ford had been shot and he and Johnson went to appellant’s house with Detective Sawyer to arrest appellant. He stated that Sawyer turned over to him the pistol that was removed from appellant’s pocket together with two spent cartridges and three live rounds. That he put his initials on the pistol and personally delivered the pistol and the cartridges to Mr. Tellis Hudson at the Toxicology Laboratory in Auburn. He stated that everything he turned over to Mr. Hudson was in the same condition as when received by him from Sawyer.
Mr. Leslie Vance testified that he was the duly elected Coroner of Russell County on May 14,1976. He went to Old Cloud 9 Club that night and pronounced Jimmy Ford, Jr. dead. He made an inventory of the personal effects of the deceased at the scene and removed a wallet and some'change from his clothing. He stated there was no weapon of any kind on the person of the deceased. He said the officers had already gotten the money that was on the floor. He stated that he ordered the body removed to the funeral home where a postmortem examination was performed.
Mr. F. C. Sumbry testified that he operated an ambulance for the Community Ambulance Service and that on the night of May 14, 1976, he was called to go to Old Cloud 9 Club to carry a body to the hospital. That he knew the deceased and he identified him to the County Coroner, and then carried the body to Sumbry Funeral Home. He said the deceased was seated in a chair just as shown in State’s Exhibit No. 2.
Samuel Williams testified that he was employed by Sumbry Funeral Home and was on duty when the body of Jimmy Ford was brought there. He further testified that on the following Monday morning a mortician by the name of Steven Taylor from the Crime Laboratory at Auburn came and picked up the body and carried it to Auburn. He stated the body was in the same condition when it was picked up as it was when he received it at the funeral home.
Mr. Carlos Rabren, a Toxicologist from the Department of Toxicology at Auburn whose qualifications were admitted by the *571 defense, testified that he conducted a postmortem examination on the body identified to him as that of Jimmy Ford. He testified that an external examination revealed three wounds of recent origin to the head.
From the record:
“The examination consisted of an external examination of the body and also an internal examination of the head.
“The external examination revealed three wounds of recent origin to the head, the first being a penetrating wound in the right forehead about one inch above the right eyebrow and just right of the center line coming down through the nose. There were also two wounds noted at the left cheek, the exact position being, the first one, one-half inch below the left eye and one inch left of the midline, and the second wound in the left cheek being one inch inferior and lateral, being below and to the left of the wound I described below the left eye. Those wounds measured in diameter: The one in the right forehead three-sixteenths in diameter; the first one in the cheek three-sixteenths in diameter; and the second one, being left and a little bit inferior, or below, three-eights of an inch in diameter.
“The internal examination consisted of a dissection of the head to examine the brain and also the nature of these wounds. First, the dissection revealed the two wounds in the left cheek were connected by a common hemorrhagic track or path of a bullet. A bullet had passed through the cheek and, in my opinion, in a downward and to the left direction, the one being closest to the eye the entrance wound and the one being away and slightly below the first wound being an exit wound, in my opinion.
* * * * * *
“The dissection of the head revealed a massive intracranial hemorrhage or a lot of blood inside the brain, inside the bone itself, and a hemorrhagic path was traced from the wound in the right forehead through the brain tissue to the left side of the head. That path was from front to rear, slightly downward and toward the left side. A large amount of trauma, or damage, was noted to the brain tissue and a massive hemorrhage or, as I said, a lot of blood was noted in the brain. I also found in the left side of the brain another projectile — or a projectile.
“I found no evidence of recent violence or trauma to the torso or to the limbs and I did not do a dissection of the chest and abdominal area.
“Q. Doctor, assuming that the projectile you referred to was a bullet, that would be consistent with, being shot twice; is that what you are saying?
“A. Yes, sir. I took two projectiles out of the body. This hole over here also had a projectile just beneath it on the left side. The projectile came down and punctured the skin but it was found just beneath the skin. And I also took one out of the left side of his head.
“Q. And did you turn those over to anyone?
“A. Yes, sir, I did. I marked those bullets for identification and turned them over to Mr. Tellis Hudson with our department.
“Q. Now, based on your training and experience and your examination both externally and internally, did you reach an opinion as to the cause of death of this person identified to you as Jimmy Ford, Jr.?
“A. Yes, sir, I did.
“Q. And what was that opinion, please, sir?
“A. In my opinion, death resulted from central nervous system or brain damage and also the intracranial hemorrhage associated with the bullet wound to the head.
“Q. In your opinion he died as a result of a gunshot wound to the head?
“A. Yes, sir, particularly the one that entered the right forehead and penetrated the brain tissue.”
Mr. Tellis Hudson testified that he was employed as a Criminalist with the State Department of Toxicology. His qualifications were admitted.
*572 Through this witness the State introduced into evidence two spent cartridges and two live rounds of .32 caliber cartridges. Mr. Hudson testified that he made a ballistics comparison test using appellant’s gun. He stated that from his training and experience he could say that the gun did in fact strike the cartridges that were turned over to him by Deputy Sheriff Woodard but because of the poor condition of the weapon that he could not conclusively say that this gun fired the slugs that were removed from the body of the deceased by Dr. Rabren and delivered to him.
Allen Davis was picked up by the police, searched and taken to the City Jail and was interrogated about the shooting at the Old Cloud 9 Club. He testified that he had been drinking heavily that night and could not remember even being in the club on the night of the shooting.
The State recalled Detective Sawyer and introduced into evidence a photograph showing that the deceased had a comb handle sticking out of his rear pocket.
The State rested its case at this point and appellant moved to exclude, the evidence on the ground the State failed to make out a prima facie case of murder in the first or second degree and the State failed to show malice. The motion was overruled and denied.
Appellant testified that he lived in the second house from Cloud 9 on the same side which would be a distance of approximately 215 feet from the club. That he went to the club often — just about every weekend. He stated that he arrived at the club on May 14, 1976 around 7:30 p. m. and that Mrs. Ford and a man were there at the time, but he didn’t know his name. That he stayed there until approximately 9 o’clock and then went to check on his children because his wife worked at night. He stated that the Robinson brothers, who owned the club, came in while he was there. That the deceased came in about thirty minutes later. He said he and the deceased had done some gambling about two or three weeks before that night and that he had won the money from him. He stated that the deceased said, “Let’s play some more cards.” The deceased asked his wife to look behind the bar to see if there were any cards there. No cards could be located and appellant gave the deceased the keys to his car to go to the house of the deceased and get a deck of cards. Appellant further testified that the deceased was gone about fifteen or twenty minutes and he went to the bar and was sipping on a beer while waiting for him to return.
According to the appellant when the deceased came back with the cards they started playing blackjack and he lost $23.00 but that was not all the money he had. He said some women got in the game and played for a while. It was at this time that he stopped playing to check on his children. When he returned he started playing again and lost some more money and left to go check on his children the second time. During the progress of the game he noticed that the deceased was dealing from the bottom of the deck and he saw the deceased take $20.00 from the table which belonged to appellant. He said he asked the deceased about his money and got no reply and he got up and went to the bar and ordered another beer. He turned and watched the continuance of the game. He then said to the deceased, “Jim, me and you been too good a friends for us to fall out about two or three dollars. Why don’t you give me my money?” That the deceased said he would give him the money but not right then. Appellant then stated he saw Ford reach in his right front pocket and attempt to pull out a gun which got caught in his pants pocket. Appellant testified he had knowledge that Ford had killed a man in a gambling game in the latter part of 1969. Appellant stated that he saw the pistol the deceased was attempting to pull out of his pocket and that it was chrome with a brown handle. He stated that at this time he had his gun in a back brace that he wore since he got injured several months previously and he burst a couple of buttons off his shirt trying to get his gun before Ford would kill him. He further testified that his back was to the bar and he was about fifteen feet from Ford when he *573 got his pistol out and shot him. He stated he then told someone to call the police and he went to his house where he was later arrested by the police.
Appellant stated that he could not have left the place from the position where he was standing because he had a bad back and he dropped his walking cane.
On cross-examination appellant admitted that no one kept him from leaving the club before he shot Ford. He further stated that Mr. Robinson was standing between him and Ford just prior to the shooting but he insisted that he could see Ford’s hand although he had to look over Robinson’s head to see Ford. He admitted that he was convicted in 1965 for assault with intent to kill and served three years in the penitentiary.-
The wife of the deceased was called by the defense and she stated that at the time of the shooting her husband did not have a pistol on his person. That the only gun he had was a .12 gauge shotgun and it was at their home.
On. cross-examination she testified that to her knowledge her husband had not carried a gun for the last five years.
Mary Frank Alexander testified for the defense and she stated that within the year before May 14, 1976, she had seen the deceased with a pistol and that it was chrome with a brown handle. She said the deceased stated that he carried his gun seven days a week. She considered him to be a “mean young man.”
Defense witness Brenda Brooks stated that she knew the deceased and had known him for several years and that he had a “nasty attitude.”
Neither of these two last witnesses testified that they knew the reputation of the deceased for violence.
The evidence in this case was conflicting on some material issues. Reconciliation of conflicting testimony is a jury function and a verdict rendered thereon will not be disturbed on appeal. Pugh v. State, 51 Ala.App. 164, 283 So.2d 616; Tolliver v. State, 50 Ala.App. 654, 282 So.2d 92; Jemison v. State, 56 Ala.App. 6, 318 So.2d 746.
Appellant claims the trial court committed reversible error in allowing the State to prove that appellant had previously been convicted of assault with intent to murder on the ground that it was highly prejudicial to his case. We disagree. Assault with intent to murder is a crime involving moral turpitude and is admissible as affecting his credibility as a witness. Ro-den v. State, 5 Ala.App. 247, 59 So. 751; Title 7, Section 434, Code of Alabama 1940.
Other than the testimony of appellant, all the evidence presented by the State showed that the deceased was unarmed and was sitting in a chair at the time appellant pumped two bullets into his head and face. The witnesses at the scene of the homicide all testified that the deceased did not get out of the chair in which he was sitting at the card table at the time appellant stood over him and shot him twice.
When the officers arrested appellant and gave him the Miranda rights and warnings, and before asking him a single question, appellant said, “I was expecting you. I shot him.” This was a “spontaneous exclamation” and admissible evidence. It is to be- noted that appellant did not then and there claim he shot the deceased in self-defense.
The trial court fully charged the jury on the law of self-defense and gave the jury all of appellant’s written requested charges. Appellant received a fair and impartial trial and that is all he was entitled to under the law.
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none.
The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.